Gerald Singlton (TX 24104254)
gsingleton@singletonschreiber.com
Meagan Verschueren (CA 313117) *Pro Hac Vice applicant*
mverschueren@singletonschreiber.com
Katie Llamas (CA 303983) *Pro Hac Vice applicant*
kllamas@singletonschreiber.com
SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Ste. 1025
San Diego, CA 92108
Tel. (619) 771-3473

Attorneys for Plaintiff JANE DOE

## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| JANE DOE, an individual,<br><br>        Plaintiffs,<br>   v.<br><br>WYNDHAM HOTELS & RESORTS, INC.;<br>WYNDHAM HOTEL GROUP, LLC; DAYS<br>INN WORLDWIDE, INC.; CHOICE HOTELS<br>INTERNATIONAL, INC.; MAGNA HOTELS,<br>LP; KASTURI, INC.; MANIR PROPERTIES<br>II LP; AND DOES 1-200, INCLUSIVE,<br><br>        Defendants. | Case No.:  3:25-cv-00137<br><br>Unlimited Jurisdiction<br><br>**COMPLAINT FOR DAMAGES AND INJURIES**<br><br>**JURY TRIAL DEMANDED**<br><br>**Damages in excess of $100,000** |

## COMPLAINT

COMES NOW the Plaintiff JANE DOE, by and through the undersigned counsel, and respectfully submits this Complaint for damages and makes the following averments.

### INTRODUCTION

1.      For years, sex trafficking ventures have brazenly operated both online, and in and out of hotels throughout the United States.

1

2.      For years, major hotel brands have made public claims that they are combatting human trafficking, while at the same time expanding their economy hotels where sex trafficking is most prevalent and profiting from crimes that are perpetrated on their properties. Despite corporate public statements, human trafficking continues to be most prevalent and lucrative in the hotel and hospitality industry.

3.      Criminals parade their misconduct openly on hotel and motel properties throughout the United States, and profit from providing harbor for the underlying assaults. The hotel and hospitality industry continue to create and expand the environment for traffickers to harbor victims and neglect taking reasonable steps to prevent such criminal misconduct, instead choosing to earn a profit at the expense of human life, human rights, and human dignity.

4.      Public appearances and sponsorships do not excuse corporations and individuals that have financially benefited from sex trafficking. In fact, it reveals corporate knowledge of the use of their properties and technology as hubs for human trafficking. The hotel industry has provided the means, environment, and support for human trafficking industry to become the second largest profitable criminal activity in the United States.[1]

5.      As the trafficking industry grows, so have Defendants and their profits through the expansion of their properties and rooms rented for this explicit and apparent purpose.

6.      JANE DOE endured sex trafficking in the hotels owned, operated, maintained, and controlled by Defendants and their agents and employees. JANE DOE was subjected to untold atrocities including but not limited to rape, verbal and physical attacks, threats, humiliation, fear, and sexual assault. Defendants continued supporting traffickers, including JANE DOE's trafficker, despite evident and apparent signs of ongoing sex trafficking at its hotels and specifically the hotels listed herein:

- Days Inn by Wyndham El Paso Airport East, 10635 Gateways Blvd West, El Paso, TX 79935;

---

[1] https://www.mbfpreventioneducation.org/human-trafficking-is-now-the-second-most-profitable-criminal-activity-in-the-united-states/

- Comfort Inn & Suites by Choice, I-10 Airport, 6645 Gateway West, El Paso, TX 79925;

- The Ramada by Wyndham El Paso, 8250 Gateway Blvd. East, El Paso, TX 79907.

7.      Jane Doe files this civil lawsuit seeking compensation for the harm she suffered as a result of being sex trafficked and sold for sex at hotels owned, operated, maintained, regulated, and controlled by Defendants and their agents and employees.

**PARTIES**

8.      JANE DOE is a natural person who at all times relevant herein was a resident of El Paso County, Texas. She was a victim of sex trafficking that took place at the Defendants' hotels for approximately six (6) months. The trafficking occurred from approximately February 2015 to July 2015. She was harbored, forced and coerced to engage in commercial sex acts for the benefit of her traffickers and Defendants.

- Due to the sensitive, private and potentially retaliatory nature of these allegations, this complaint identifies JANE DOE by a pseudonym only. JANE DOE will move the Court to proceed under a pseudonym in all filings, all public court proceedings, and to limit the disclosure of information about JANE DOE's true identity in order to protect JANE DOE and JANE DOE's identity.

- Generally, pleadings must state the name of all parties.[2] However, there are exceptions when the issues involved may result in retaliation or harm to the Plaintiff. For good cause, the Court may issue an order to protect a party or person from undue harms and burdens.

- In order to maintain her privacy and safety, JANE DOE should not be compelled to disclose her identity. JANE DOE's privacy interest substantially

---

[2] Fed. R. Civ. P. 10(a).

3

outweighs the customary practice of judicial openness. JANE DOE would be in danger of being forced back into trafficking should her trafficker or his associates learn information about her through publicly filed documents in this action. Additionally, JANE DOE's life could be put in grave danger should her trafficker or his associates learn information about her through publicly filed documents in this action. Moreover, Defendants will not be prejudiced. JANE DOE will agree to reveal her identity to Defendants for the limited purpose of investigating JANE DOE's claims once the parties have entered into a protective order.

9.    Upon information and belief at all times relevant herein, Defendant KASTURI, INC., was and is a for-profit incorporated company with its principal place of business in El Paso County, Texas.

- Upon information and belief at all times relevant herein, Defendant KASTURI, INC owned, managed, maintained, inspected secured, supervised and/or controlled the premises at Ramada by Wyndham located at 8250 Gateway Blvd East, El Paso, Texas 79907, where JANE DOE was regularly harbored, forced and coerced to engage in commercial sex acts for the benefit of her traffickers and Defendants.

10.    Upon information and belief at all times relevant herein, Defendant MANIR PROPERTIES II, LP was and is a for-profit limited partnership with its principal place of business in El Paso, County, Texas.

- Upon information and belief at all times relevant herein, Defendant MANIR PROPERTIES II, LP owned, managed, maintained, inspected, secured, supervised and/or controlled the premises at Comfort Inn & Suites located at 6645 Gateway, Blvd West, El Paso, Texas 79925, where JANE DOE was regularly harbored, forced and coerced to engage in commercial sex acts for the benefit of her traffickers and Defendants.

4

11.    Upon information and belief at all times relevant herein, Defendant MAGNA HOTELS, LP was and is a for-profit limited partnership with its principal place of business in El Paso County, Texas.

- Upon information and belief at all times relevant herein, Defendant owned, managed, maintained, inspected, secured, supervised and/or controlled the premises at Days Inn by Wyndham El Paso East, located at 10635 Gateway Blvd West, El Paso, Texas 79935, where JANE DOE was regularly harbored, forced and coerced to engage in commercial sex acts for the benefit of her traffickers and Defendants.

12.    Defendants KASTURI, INC.; MANIR PROPERTIES II, LP; and MAGNA HOTELS, LP will collectively be referred to as "Hotel Defendants."

13.    Defendant WYNDHAM HOTELS & RESORTS, INC., ("WHR") is a corporation that brands, instructs, advertises for, controls, and contracts with about 9,000 branded properties for profit including Ramada by Wyndham and Days Inn by Wyndham and specifically with MAGNA HOTELS, LP, and KASTURI, INC, for the subject Days Inn and Ramada where JANE DOE was trafficked. It is a Delaware Corporation with its principal place of business in Parsippany, State of New Jersey and can be served through its registered agent in Wilmington, Delaware.

- WYNDHAM is a successor to Wyndham Worldwide Corporation and is liable under successor liability for the wrongful acts of Wyndham Worldwide Corp., so "WHR" as referred to herein, also includes Wyndham Worldwide Corporation.

- Upon information and belief at all times relevant herein, Defendant WHR owned operated, managed, maintained, inspected, secured, supervised, and/or controlled the premises at Days Inn by Wyndham El Paso Airport East, located at 10635 Gateway Blvd West, El Paso, TX 79935 and the Ramada by Wyndham El Paso, located at 8250 Gateway Blvd East, El Paso, TX 79907,

where JANE DOE was regularly harbored, forced and coerced to engage in commercial sex acts for the benefit of her traffickers and subject Defendants.

- Throughout 2015 WYNDHAM HOTELS & RESORTS, INC transacted business in El Paso County, Texas, and purposefully availed itself to El Paso County, Texas and the citizens of El Paso County, Texas through the subject Days Inn and Ramada.

- WHR is one of the WYNDHAM BRAND DEFENDANTS.

14.    WYNDHAM HOTEL GROUP, LLC (WHG) is a for-profit Delaware company with its principal place of business in Parsippany, New Jersey. Upon information and belief, WHG is a wholly owned subsidiary of WHR and a former subsidiary of Wyndham Worldwide Corporation. WHG is one of the WYNDHAM BRAND DEFENDANTS.

- WHG owned operated, managed, maintained, inspected, secured, supervised, and/or controlled the premises at Days Inn by Wyndham El Paso Airport East, located at 10635 Gateway Blvd West, El Paso, TX 79935 and the Ramada by Wyndham El Paso, located at 8250 Gateway Blvd East, El Paso, TX 79907, where JANE DOE was regularly harbored, forced and coerced to engage in commercial sex acts for the benefit of her traffickers and subject Defendants.

15.    DAYS INN WORLDWIDE, INC. ("DIW") is a for-profit Delaware company with its principal place of business in Parsippany, New Jersey. Upon information and belief, DIW is a direct subsidiary of WHG, an indirect subsidiary of WHR, and a former subsidiary of Wyndham Worldwide Corporation. DIW is one of the WYNDHAM BRAND DEFENDANTS.

- DIW owned operated, managed, maintained, inspected, secured, supervised, and/or controlled the premises at Days Inn by Wyndham El Paso Airport East, located at 10635 Gateway Blvd West, El Paso, TX 79935 and the Ramada by Wyndham El Paso, located at 8250 Gateway Blvd East, El Paso, TX 79907, where JANE DOE was regularly harbored, forced and coerced to engage in commercial sex acts for the benefit of her traffickers and subject Defendants.

16.    DIW, WHG, and WHR will collectively be referred to as WYNDHAM BRAND DEFENDANTS.

17.    Defendant CHOICE HOTELS INTERNATIONAL, INC. ("CHOICE" as referred to herein) is a Delaware corporation with its headquarters in Rockville, Maryland and can be served through its registered agent Corporation Service Company, at Wilmington, Delaware.

- CHOICE is one of the largest hotel franchisors in the world and offers its brand public lodging services through its affiliates, subsidiaries, and franchisees. It is a corporation that brands, instructs, advertises for, controls, and contracts with about 7,400 branded properties for profit, including Comfort Inn & Suites, specifically with MANIR PROPERTIES II, LP., for the subject Comfort Inn & Suites by Choice where JANE DOE was trafficked.

- Upon information and belief at all times relevant herein, Defendant CHOICE owned, managed, maintained, inspected, secured, supervised and/or controlled the premises at the subject Comfort Inn & Suites by Choice.

- Upon information and belief CHOICE properties included the Comfort Inn & Suites by Choice located at 6645 Gateway Blvd West, El Paso, TX 79925.

- Throughout 2015, CHOICE transacted business in El Paso County, Texas, and purposefully availed itself to El Paso County, Texas, and the citizens of El Paso County Texas, through the subject Comfort Inn & Suites.

18.    WYNDHAM BRAND DEFENDANTS and CHOICE HOTELS INTERNATIONAL, INC. will collectively be referred to as "Parent Hotel Defendants."

## JURSIDCITION AND VENUE

19.    This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the Trafficking Victims Protection Reauthorization Act ("TVPRA").

20.     Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims asserted in this action, including the Defendants' misconduct and omissions, led to injuries that occurred in the judicial district where this action is brought.

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because, pursuant to 28 U.S.C. §§ 1391(c)(2) and 1391(d), at least one Defendant is a resident of El Paso County, Texas, and all Defendants are registered to do business in California.

## SEX TRAFFICKING UNDER FEDERAL LAW

22.     Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[3]

23.     The requirements for liability under the TVPRA on a beneficiary theory can be stated as follows: (1) the person or entity "knowingly benefits, financially or by receiving anything of value" (2) "from participating in a venture" (3) that the "person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a).

24.     "Sex trafficking" is defined by the TVPRA under 22 U.S.C. § 7102(12) as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of a commercial sex act."

25.     The term "severe forms of trafficking in persons" includes "sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age." 22 U.S.C. § 7102(11).

## FACTUAL ALLEGATIONS

**Sex Trafficking of Plaintiff**

26.     In 2015, JANE DOE was a victim of unlawful sex trafficking at the hotels owned, operated, managed, and controlled by Defendants.

---

[3] 18 U.S.C. §1591; 22 U.S.C. § 7102.

27.     Starting in 2015, JANE DOE was subjected to sex trafficking at the Comfort Inn & Suites I-10 Airport, at 6645 Gateway Blvd West, El Paso, TX, 79925; The Ramada by Wyndham El Paso, at 8250 Gateway Blvd East, El Paso, TX 79907; and the Days Inn by Wyndham El Paso Airport East, at 10635 Gateway Blvd West, El Paso, Tx 79935.

28.     For months JANE DOE's trafficker rotated between these hotels. These hotels were used by JANE DOE's trafficker for days at a time, encountering the same staff.

29.     JANE DOE's trafficker would use the same named locations so often that she started to quickly recognize staff. The front desk and other staff would consistently see JANE DOE with her trafficker as well as her trafficker's other victims, some being minors. They would have realized they kept returning and exhibiting red flags of trafficking.

30.     JANE DOE was drugged, trapped and controlled with severe abuse, weapons, threats, physical force, manipulation, and coercion. She was raped by her trafficker and his customers multiple times a day for months. The same was true for at least two other minor victims that her trafficker had.

31.     JANE DOE was forced to wear provocative clothing such as lingerie and heels while at the subject hotels. JANE DOE's trafficker used the subject hotel rooms to escort and force JANE DOE, as well as two other minor victims, to have sex with as many as eight (8) "Johns", or sex buyers, every day/night. Johns came and went from the hotel rooms for approximately an hour at a time.

32.     During this time, JANE DOE was forced to work through the night and would only get about four (4) hours of sleep each day. At times JANE DOE was only allowed to eat one (1) meal per day. JANE Doe was visibly sleep deprived and extremely malnourished. In addition, the two minors who were also being trafficked by her trafficker were in the same condition and subjected to the same treatment.

33.     JANE DOE's trafficker physically, mentally and emotionally abused her while at the subject hotels. Her signs of abuse were visible through her scars and bruises. The same was true for the two minor victims also trafficked at the same time as JANE DOE.

9

34.     JANE DOE's trafficker referred to her as his money, property, and merchandise. He began to control her through hunger, physical violence, force, threats, weapons, and drug addiction to make her engage in commercial sex acts for his financial benefit, all of which were apparent to the outside world, including Defendants named herein.

35.     JANE DOE was trapped and was terrified to attempt to escape.

36.     JANE DOE's trafficker controlled her every move. She was threatened, blackmailed and feared for her life. Food and other basic necessities were withheld unless she obeyed.

37.     JANE DOE sustained permanent and disabling bodily injuries as a result of the abuse of her trafficker, including mental and emotional trauma. JANE DOE continues to suffer from mental and emotional health problems, which impact her life on a daily basis. It is foreseeable the JANE DOE will suffer from the horrible effects of her trafficking for the rest of her life.

38.     JANE DOE's trafficker drugged her in order to force her into sex acts with buyers. As a result of this forced drug use, she developed a severe drug addiction which she has since sought treatment to overcome. JANE DOE's trafficker used this forced drug use as a means to further control JANE DOE during her time of trafficking.

39.     While at the subject hotels, JANE DOE's trafficker would often scream at her and beat her by punching her face and other parts of her body. She suffered from black eyes and busted lips, which took weeks to recover from. She had visible bleeding and bruises. The staff at the subject hotels heard and saw these signs of abuse but continued to rent rooms to her trafficker.

40.     JANE DOE's trafficker would often rent three rooms at a time, one for him, one for her and one for the other young girls, who were minors, he was trafficking.

41.     JANE DOE's trafficker would escort her and the others being trafficked to the rooms he rented. JANE DOE was rarely allowed to be alone.

42.    JANE DOE was not only beaten herself, but she witnessed her trafficker beat other young girls and women that he was trafficking at the same time.

43.    JANE DOE's trafficker was trafficking at least two others during this time at the same subject hotel locations.

44.    Upon information and belief, both of the other victims that were being trafficked at the same locations with JANE DOE, were minors.

45.    JANE DOE's trafficker was arrested for trafficking JANE DOE as well as at least one minor in August 2015. He pled guilty and was sentenced to 15 years in prison, followed by five years supervised release as well as other conditions.

46.    At all the hotel locations named herein, JANE DOE's trafficker would not allow the cleaning crew in to clean the room or change out linens or towels. Instead, JANE DOE or her trafficker would ask for an extraordinary amount of linens and towels throughout their stays.

47.    While staying at the subject locations, JANE DOE's trafficker would post advertisements online offering JANE DOE for commercial sex acts to take place at the subject hotels and communicated with "johns" responding to the advertisements. While staying at the subject hotel locations, JANE DOE was forced to take multiple dates per day at all hours.

48.    With each stay at the subject locations, it resulted in several consistent red flags, including but not limited to: paying for stays in cash; paying for extended stays on a day-to-day basis; requesting certain rooms away from other guests; obvious signs of illegal drug use; frequent requests for clean linens or towels; unusually large numbers of used condoms in the trash; unusually large numbers of male visitors going in and out of JANE DOE's room at all times during the day and night; visible signs of physical abuse; women wearing clothing inappropriate for the weather; young minor girls with JANE DOE's trafficker; multiple women with one controlling male; a male with young girls requesting multiple rooms; a male with young girls returning to the hotel locations again and again; and loud noises of abuse and other violence audible to staff and/or other rooms.

49.    These red flags were open and obvious to anyone working at the subject hotel locations and lasted for months.

**The Hotel Industry's Role in Sex Trafficking**

50.    The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what the Defendants knew or should have known regarding the trafficking at their hotel properties, including the trafficking of JANE DOE and the other two young females.

51.    Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[4] For years, sex traffickers have "been able to reap their profits with little risk when attempting to operate within hotels."[5]

52.    An estimated twenty-five million people worldwide, including over 300,000 in Texas are victims of human trafficking.[6]

53.    In 2015, Texas had the second highest number of calls to the National Human Trafficking Resource Center hotline.[7]

54.    In 2017, human trafficking was noted as the world's fastest growing crime.[8] While the term "human trafficking" incorporates all forced labor, the sex trafficking industry

---

[4] This is not only a dominant issue, it's an epidemic issue." See Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune (April 2019), https://fortune.com/2019/04/14/human-sex-trafficking-us- slavery/ (citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council). "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." Id.
[5] See Human Trafficking in the Hotel Industry, Polaris Project (Feb. 10, 2016), https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; see also Eleanor Goldberg, You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic, Huffington Post (June 2016), http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victimslife_us_57714091e4b0f168323a1ed7.
[6] https://thelanding.org/safety-exit-test/
[7] https://prattontexas.com/2016/01/14/texas-attorney-general-paxton-on-human-trafficking/
[8] Human Trafficking is the World's Fastest Growing Crime. May 22, 2017. The Advisory Board. Available at:
https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking

alone pulls in an estimated $99 billion each year making it the second largest illicit crime industry behind only the sale of all illegal drugs.[9]

55. The hospitality industry plays a crucial role in the sex trade.[10] Hotels have long profited from their reputations as havens of privacy and discretion for the offending. Despite the known risks and known trafficking crimes, hotels, including the Defendants, offer anonymity and non-traceability to the traffickers, making them ideal venues for crime and sex trafficking in particular. Hotels, including the Defendants, knowingly harbor traffickers, buyers, and victims.

56. According to National Human Trafficking Hotline statistics, hotels are the top-reported venue, even over commercial front brothels, where sex trafficking acts occur. Traffickers and buyers alike frequently use hotel rooms to exploit victims.

57. In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels. Hotels have been found to account for over 90% of commercial exploitation of children.

58. Due to the overall hospitality industry's complacency, complicity, and reckless disregard in addressing the known issue of sex trafficking, hotels are the venue of choice for sex trafficking. Traffickers and buyers capitalize on the hotel industry's general refusal to (1) adopt and enforce companywide anti-trafficking policies from the corporate to the property level, (2) train staff on what to look for and how to respond, and/or (3) establish safe and secure reporting mechanisms for those at the point of sale.

59. Every day, thousands of hotel employees witness manifestations of sex trafficking and commercial exploitation. Thus, the hospitality industry has the greatest reach to prevent, identify and thwart sexual exploitation where it is most likely to occur.

---

[9] Profits and Poverty: The Economics of Forced Labor. May 24, 2014. International Labor Organization. Available
at: http://www.ilo.org/global/publications/ilo-bookstore/order-online/books/WCMS_243391/lang--en/index htm.
[10] Cavagnaro, Giovanna L. C. 2017. Sex Trafficking: The Hospitality Industry's Role and Responsibility. Cornell
University School of Hotel Administration. Available at:
http://scholarship.sha.cornell.edu/honorstheses/3.

60.      Hotels and motels have the highest obligation to protect their guests from known dangers, including sex trafficking and sexual exploitation and should be held accountable when they fail to comply. As stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."

61.      Even estimates by attorneys for the hospitality industry indicate that eight (8) out of ten (10) arrests for human trafficking occur in or around hotels.[11] The 2016 Trafficking in Persons Report issued by the United States Department of State also confirmed that human trafficking occurs in the hospitality industry in the United States.

62.      The complicity of the hospitality industry is essential to the perpetuation of human trafficking, allowing traffickers to remain transient, collect profits, and evade detection. Sex trafficking ventures move from place to place so that they are less visible to law enforcement. Similarly, sex traffickers also want to keep their victims moving from place to place to isolate them from any possible means of escape or rescue. Traffickers are well aware of the seclusion and anonymity attendant with booking rooms with certain hotel chains, including the hotel chains named in this complaint — they know it is unlikely that they will be disturbed.

63.      Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.

64.      The most effective weapon against sexual exploitation and human trafficking is education and training.[12] As Protect All Children from Trafficking (PACT) concluded:

> *Due to the anonymous, risk-free nature of the hospitality industry, children across the globe are exploited in hotels—ranging from budget properties to luxury resorts. Hotel associates are uniquely situated to identify and report suspicious activity. From check-in to check-out there are a number of*

---

[11] U.S. Dep't of State. 2016. 2016 Trafficking in Persons Report, at 387. Available at: https://www.state.gov/documents/organization/258876.pdf.
[12] Polaris Project, *Recognizing Human trafficking*, https://polarisproject.org/recognizing-human-trafficking/

*indicators victims and traffickers exhibit during the time they are on a hotel property. With proper training, a front desk agent or a housekeeper can notice that something is not right and respond.[13]*

65.     There are abundant free resources available to the hotel industry that provide effective trafficking recognition and response training. Every hotel—large and small, luxury and modest, urban and rural—has the resources to implement a viable anti-trafficking program to protect victims.

66.     Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Washington Attorney General, Love 146, and EPCAT, among numerous others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[14]

67.     The leading federal agency in this area is The United States Department of Homeland Security (DHS) Blue Campaign. The Blue Campaign is the unified voice for the U.S. Department of Homeland Security's efforts to combat human trafficking. The Blue Campaign was established in 2010 with the goal of eradicating human trafficking, protecting vulnerable victims, and prosecuting traffickers. Working with law enforcement, government and non-governmental and private organizations, the Blue Campaign strives to protect the basic right of freedom and bring those who exploit human lives to justice.[15]

68.     The Blue Campaign recognizes that traffickers have long used the hotel industry for sex trafficking and offers resources for the industry, including an essential list of actions these businesses can take to help stop human trafficking.

69.     The Blue Campaign has produced lists of warning signs of human trafficking for members of the hotel industry. DHS remarked "Hotel and hotel employees are often in the best

---

[13] PACT USA, *Hotel Training for Associates and Managers*, https://courses.wearepact.org/hotel-training
[14] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf
[15] https://www.dhs.gov/blue-campaign

position to see potential signs of human trafficking, especially since [hotel employees'] duties give [hotel employees] access to different areas of the properties. [Hotel employees] may also have direct or indirect contact with both traffickers and victims."[16] Sex trafficking "red flags" applicable to this lawsuit are described below. The compendium of "red flags" is available as part of the Blue campaign Hospitality Toolkit. [17]

70. The Blue Campaign provides specific "signs of human trafficking for housekeeping, maintenance, and room service staff.[18] According to the Blue Campaign: "Housekeeping, maintenance, and room service staff typically have the most access to guest rooms where signs of human trafficking may be apparent. By being conscious of human trafficking indicators, [hotel staff] can help identify possible human trafficking activities and victims."

71. There is a distinct list of "red flags" that pertain specifically to "concierge, bellman, front desk, security, and valet staff." These employees are typically the first to see guests when they enter the hotel and should be trained to detect signs of potential trafficking."[19]

72. There is yet an additional category dedicated to providing signs of human trafficking for "food and beverage staff" in the hospitality industry.

73. Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants are aware or should be aware of and were aware or should have been aware of at all subject times of the trafficking alleged herein, are specific to the hotel industry. These include learning to identify warning signs and indicators of sex trafficking, including but not limited to:

    a. Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

---

[16] *Id*; *see also* Indicators of Human Trafficking, https://www.dhs.gov/blue-campaign/indicators-human-trafficking

[17] Blue Campaign. One Voice. One Mission. End Human Trafficking. Hospitality Toolkit. https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

[18] *Id.*

[19] *Id.*

b.  Individuals show signs of physical abuse, restraint, and/or confinement;

c.  Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

d.  Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

e.  Individuals lack freedom of movement or are constantly monitored;

f.  Individuals avoid eye contact and interaction with others;

g.  Individuals have no control over or possession of money or ID;

h.  Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

i.  Individuals have few or no personal items—such as no luggage or other bags;

j.  Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

k.  A group of girls appears to be traveling with an older female or male;

l.  A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

m. Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

n.  Possession and presence of bulk sexual paraphernalia such as condoms or lubricant;

o.  Smell of bodily fluids and musk;

p.  The same person reserving multiple rooms;

q.  Individuals leaving the room infrequently, not at all, or at odd hours;

r.  Provocative clothing;

s.  Room paid for with cash or pre-loaded credit card;

t.  Car in parking lot regularly parked backward, so the license plate is not visible

u.  Possession or use of multiple cell phones; and

17

v.  Possession or use of large amounts of cash or pre-paid cards.

74.     The above policies and warning signs are designed to reduce sex trafficking. These "red flags" compose the standard of corporate behavior in the hospitality industry and were known to the industry long before 2015, when the trafficking of JANE DOE occurred.

75.     The Department of Homeland Security urges businesses—such as the subject hotels and hotel chains—to utilize the free educational services offered by the Blue Campaign to help identify victims of human trafficking by raising awareness and encouraging the public to report instances of human trafficking.[20]

76.     The Blue Campaign is just one of many educational mechanisms that hotels, including Defendants, have access to.

77.     Federal government agencies also publish extensive tools for responding to suspected sex trafficking. One compendium is the United States Department of Health and Human Services "Identifying Victims of Human Trafficking – Fact Sheet."[21] This document acknowledges that responding to sex trafficking requires affirmative action: "It is important to be vigilant and to 'look beneath the surface' in situations that don't seem quite right. One chance encounter could be a victim's best hope for rescue."[22]

78.     The Office of the Texas Attorney General sponsors guidelines and information on this subject, including a list of "Human Trafficking Red Flags."[23] This document enumerates some of the more prominent warning signs that should give rise to a suspicion that an individual may be subject to coercion, force, or otherwise being held against their will.

79.     It is widely recognized that effective training has a substantial, positive impact on the prevalence and scope of trafficking.[24] According to the American Hotel Lodging Association:

---

[20] https://www.dhs.gov/blue-campaign

[21] United States Department of Health and Human Services, Fact Sheet: Identifying Victims of Human Trafficking, https://acf.gov/sites/default/files/documents/orr/fact_sheet_identifying_victims_of_human_trafficking.pdf

[22] *Id*.

[23] Texas Attorney General, Human Trafficking Red Flags, https://www.texasattorneygeneral.gov/human-trafficking-section/signs-trafficking/red-flags-sex-trafficking

[24] Emily Roman, "Evaluating the Impact of Training Employees to Identify Victims of Human Trafficking" (2019). Digital Commons @ ACU, Electronic Theses and Dissertations. Paper 152, https://core.ac.uk/download/212874317.pdf

"Hotel employees who have undergone training are more aware of trafficking when it happens and are more willing to report it – than those who have not been trained."[25]

80.     Thus, when hotels implement viable anti-trafficking measures, provide proper training, and more importantly enforce anti-trafficking policies, trafficking is less likely to occur, and victims are more likely to be rescued.

81.     Conversely, when training is not provided and when anti-trafficking policies are not enforced, insidious criminal trafficking ventures will flourish. Human trafficking is fueled by profits, and traffickers capitalize on environments where human trafficking can go unchecked.

82.     The foregoing discussion establishes there are long-standing, well known, viable standards of conduct and corporate operations available to the hotel industry to combat sex trafficking. These guidelines were known to members of the hospitality industry, including Defendants, well before 2015 and at the time JANE DOE was trafficked.

83.     At all times of trafficking alleged herein, Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking and should have seen signs of the sex trafficking of JANE DOE that was observable by Defendants.

84.     Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, including the subject properties, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

85.     Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of Defendants to continue generating revenue from traffickers without taking reasonable steps to identify and prevent

---

[25] American Hotel Lodging Association, No Room for Trafficking, https://www.ahlafoundation.org/nrft/

trafficking in its hotels, is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

**PARENT HOTEL DEFENDANTS' Control Over Their Hotel Locations**

86.    PARENT HOTEL DEFENDANTS are vicariously liable for the acts, omissions, and knowledge of their HOTEL DEFENDANTS and staff of the subject hotel locations named herein, which are PARENT HOTEL DEFENDANTS' actual agents or subagents.

87.    Upon information and belief, it is a standard practice in the hospitality industry, followed by all Defendants, for parent companies to set exacting brand quality standards reaching everything from the temperature at which coffee shall be served, to the number of pillows that are placed on the beds, to the types of payments accepted, to when, where, and how guests are greeted.

88.    PARENT HOTEL DEFENDANTS provide their HOTEL DEFENDANTS with signage on and in front of the building. This is done to assure customers that when they check in, they can expect an experience consistent with the standards of the parent hotel brand. This brand logo is displayed on everything in the hotel, such as pens and paper on the bedside table and staff uniforms worn at the front desk during check in.

89.    PARENT HOTEL DEFENDANTS provide their hotel locations brand name recognition, a marketing campaign, and hotel listings in the Global Distribution System and other online agency databases. They also provide access to their brand-wide central reservation systems, 800 numbers, revenue management tools, brand loyalty programs, and company websites. Therefore, bookings and room reservations are primarily controlled by PARENT HOTEL DEFENDANTS.[26]

90.    PARENT HOTEL DEFENDANTS subject HOTEL DEFENDANTS and the subject locations to detailed standards and requirements regarding the operation of the subject hotel locations named herein through the franchising agreements, detailed written policies and

---

[26] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (Apr. 10,2018), The Origins and Growth of Franchising in the Hotel Industry (lodgingmagazine.com).

manuals and through other formal and informal protocols, directives, mandates, reporting, and expectations imposed by the PARENT HOTEL DEFENDANTS.

91.     Upon information and belief, PARENT HOTEL DEFENDANTS require their branded HOTEL DEFENDANTS' properties to use a property management system that is linked back to the PARENT HOTEL DEFENDANTS. This system is linked to the PARENT HOTEL DEFENDANTS' corporate network and data center. This is to, among other things, receive reservations, process payment transactions, get data about guests, and get data about crime and other incidents of concern, including human trafficking.

92.     Upon information and belief, per the relevant franchise agreements, PARENT HOTEL DEFENDANTS may enforce their brand standards and exercise their control through periodic, regular inspections of the hotel locations, including the subject locations named herein and during the subject time period. This was backed up with the ultimate threat of termination of the agreement and operations.[27]

93.     Upon information and belief, WYNDHAM BRAND DEFENDANTS did exercise their control through periodic, regular inspections of the subject Ramada named herein during the time JANE DOE was trafficked.

94.     Upon information and belief, CHOICE did exercise their control through periodic, regular inspections of the subject Comfort Inn & Suites named herein during the time JANE DOE was trafficked.

95.     Upon information and belief, WYNDHAM BRAND DEFENDANTS did exercise their control through periodic, regular inspections of the subject Days Inn named herein during the time JANE DOE was trafficked.

**The Ramada by Wyndham and Days Inn by Wyndham Owners, Employees, and Staff Acted as Actual Agents of WYNDHAM BRAND DEFENDANTS**

---

[27] Many of the franchise disclosure documents, which outline the policies and procedures of franchise agreements can be accessed publicly on https://fddexchange.com/view-fdd-docs.

96.    WYNDHAM BRAND DEFENDANTS are vicariously liable for the acts, omissions, and knowledge of their employees, agents and staff of the subject Ramada and Days Inn locations described herein, which are WYNDHAM BRAND DEFENDANTS actual agents or subagents.

97.    Days Inn owners, Ramada owners and WYNDHAM BRAND DEFENDANTS subjected the Days Inn and Ramada employees and agents to detailed training, standards, and requirements regarding the operation of the Days Inn and Ramada locations named herein through their agreements, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, reporting, and expectations imposed by WYNDHAM BRAND DEFENDANTS —and the Corporation retained the right to enforce its training, policies, and rules and standards.

98.    Upon information and belief, the standards that Defendant WYNDHAM BRAND DEFENDANTS imposed and imposes on their branded properties at all relevant times included but were not limited to the following:

- Did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools the subject Days Inn and Ramada used at its locations named herein;

- Covered virtually all aspects of hotel operations, including internal operating functions;

- Dictated the specific manner in which Days Inn and Ramada owners and the subject Days Inn and Ramada hotel staff must carry out most day-to-day functions at the subject Days Inn and Ramada; and

- Significantly exceeded what was necessary for WYNDHAM BRAND DEFENDANTS to protect its registered trademarks.

99.    In addition to the ways described above, upon information and belief, WYNDHAM BRAND DEFENDANTS exercised and reserved the right to exercise systemic and pervasive control over Days Inn owners', Ramada owners' and the subject Days Inn and

22

Ramada's day to day operation of the subject Days Inn and Ramada locations during relevant times, including the following ways:

    a. WYNDHAM BRAND DEFENDANTS required the subject Days Inn and Ramada and management and employees of the subject Days Inn and Ramada to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for WYNDHAM BRAND DEFENDANTS to protect their registered trademarks;

    b. WYNDHAM BRAND DEFENDANTS provided training for hotel management and select hotel staff on-site at the hotel locations selected by Defendant WYNDHAM BRAND DEFENDANTS;

    c. WYNDHAM BRAND DEFENDANTS required all hotel staff to participate in training it created through an online learning platform it controlled and maintained;

    d. WYNDHAM BRAND DEFENDANTS controlled training provided by the subject Days Inn and Ramada to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

    e. WYNDHAM BRAND DEFENDANTS retained sole discretion to determine whether all training had been completed satisfactorily;

    f. For certain products and services that the subject Days Inn and Ramada owners were required to purchase to operate the hotel locations named herein, WYNDHAM BRAND DEFENDANTS designated approved vendors and prohibited the locations from purchasing goods and services from anyone other than an approved vendor;

g. WYNDHAM BRAND DEFENDANTS required the subject Days Inn and Ramada owners to sign a technology agreement governing the terms under which they must procure and use technical services and software while operating the hotel locations named herein. The subject Days Inn and Ramada owners were required to install, and use certain brands, types, makes, and/or models of hardware, software, peripheral equipment, and support services to perform internal operating functions at the hotel;

h. WYNDHAM BRAND DEFENDANTS set required staffing levels for the subject Days Inn and Ramada named herein;

i. WYNDHAM BRAND DEFENDANTS established detailed job descriptions for all positions in its hotel properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

j. WYNDHAM BRAND DEFENDANTS set requirements for the hiring process used by the subject Days Inn and Ramada and oversaw employee discipline processes and termination decisions;

k. WYNDHAM BRAND DEFENDANTS provided benefits for employees of the subject Days Inn and Ramada;

l. WYNDHAM BRAND DEFENDANTS required the subject Days Inn and Ramada to use a customer resource management program maintained and operated by WYNDHAM BRAND DEFENDANTS;

m. WYNDHAM BRAND DEFENDANTS controlled channels for guests to report complaints or provide feedback regarding the hotel locations and directly participated in the response and/or supervised the response to customer complaints or other feedback. WYNDHAM BRAND DEFENDANTS retained the right to provide refunds or other compensation to

guests and to require the subject Days Inn and Ramada to pay associated costs;

n.  WYNDHAM BRAND DEFENDANTS generated reports and analysis of guest complaints and online reviews for the subject Days Inn and Ramada;

o.  WYNDHAM BRAND DEFENDANTS required the subject Days Inn and Ramada to use a Guest Relations Application owned, operated, and maintained by WYNDHAM BRAND DEFENDANTS to manage all guest data and information. WYNDHAM BRAND DEFENDANTS could use the backend of this system to analyze data and generate reports;

p. WYNDHAM BRAND DEFENDANTS set detailed requirements for insurance that the subject Days Inn and Ramada must purchase and retained the right to purchase insurance for the subject Days Inn and Ramada and to bill them directly for that insurance if WYNDHAM BRAND DEFENDANTS determined that they had not purchased adequate insurance;

q WYNDHAM BRAND DEFENDANTS regularly audited the books and records of the subject Days Inn and Ramada;

r. WYNDHAM BRAND DEFENDANTS conducted frequent and unscheduled inspections of hotel properties, including the subject Days Inn and Ramada;

s. WYNDHAM BRAND DEFENDANTS retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of any agreements if the subject Days Inn and Ramada violated any of WYNDHAM BRAND DEFENDANTS' detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the hotel locations named herein;

t. WYNDHAM BRAND DEFENDANTS controlled all marketing for the subject Days Inn and Ramada and prohibited them from maintaining any online

presence unless specifically reviewed and approved by WYNDHAM BRAND DEFENDANTS;

u. WYNDHAM BRAND DEFENDANTS imposed detailed recordkeeping and reporting requirements on the subject Days Inn and Ramada regarding virtually all aspects of hotel operations;

v. WYNDHAM BRAND DEFENDANTS supervised and controlled day-to-day operations of the subject Days Inn and Ramada through detailed information and extensive reports that it obtained through the property management system and other software systems it required the subject Days Inn and Ramada to use; and

w. WYNDHAM BRAND DEFENDANTS retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

**Comfort Inn & Suites Owners, Employees, and Staff Acted as Actual Agents of Choice Hotels International, Inc.**

100.    CHOICE HOTELS INTERNATIONAL, INC is vicariously liable for the acts, omissions, and knowledge of the subject Comfort Inn & Suites and the staff, management and owners of this location named herein, which are CHOICE HOTELS INTERNATIONAL, INC's actual agents or subagents.

101.    CHOICE HOTELS INTERNATIONAL, INC exercises day-to-day control over the subject Comfort Inn & Suites and its other brand hotels through centralized corporate systems, training, policies and brand standards.

102.    Upon information and belief, CHOICE HOTELS INTERNATIONAL, INC controls the operations of its branded properties, including the subject Comfort Inn & Suites, through various means enforced through franchise agreements and other related contacts. Some examples of how CHOICE HOTELS INTERNATIONAL, INC does this are:

26

- Gathering reports of data generated by branded locations. This includes reservation, payment, and occupancy information through CHOICE's centralized systems;

- Requiring each location to keep audit reports and other records;

- Each location must use CHOICE's property management system;

- Regular inspections to ensure compliance with agreements;

- Providing marketing requirements and standardized marketing services for each location;

- Regulating policies and procedures;

- Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

- Providing training and orientation materials for branded property staff;

- Insurance coverage requirements;

- Regulating room rates.[28]

103.    In addition to the ways described above, upon information and belief, CHOICE HOTELS INTERNATIONAL, INC exercised and reserved the right to exercise systemic and pervasive control over the subject Comfort Inn & Suite's day-to-day operation of the location named herein, including the following ways:

a. CHOICE HOTELS INTERNATIONAL, INC required Comfort Inn & Suites and management of Comfort Inn & Suites to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for CHOICE HOTELS INTERNATIONAL, INC to protect their registered trademarks;

---

[28] See Quality Inn 2022 Franchise Disclosure Document, https://fddexchange.com/view-fdd-quality-inn-2022-fdd-franchise-information

b. CHOICE HOTELS INTERNATIONAL, INC provided training for hotel management and select hotel staff on-site at the subject hotel location selected by CHOICE HOTELS INTERNATIONAL, INC;

c. CHOICE HOTELS INTERNATIONAL, INC required all hotel staff to participate in training it created through an online learning platform it controlled and maintained;

d. CHOICE HOTELS INTERNATIONAL, INC controlled training provided by the subject Comfort Inn & Suites to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

e. CHOICE HOTELS INTERNATIONAL, INC retained sole discretion to determine whether all training had been completed satisfactorily;

f. For certain products and services that the subject Comfort Inn & Suites was required to purchase to operate, CHOICE HOTELS INTERNATIONAL, INC designated approved vendors and prohibited the locations from purchasing goods and services from anyone other than an approved vendor;

g. CHOICE HOTELS INTERNATIONAL, INC required the subject Comfort Inn & Suites to sign a technology agreement governing the terms under which they must procure and use technical services and software while operating the hotel location named herein. The Comfort Inn & Suites was required to install, and use certain brands, types, makes, and/or models of hardware, software, peripheral equipment, and support services to perform internal operating functions at the hotel;

h. CHOICE HOTELS INTERNATIONAL, INC set the required staffing levels for the subject Comfort Inn & Suites;

i. CHOICE HOTELS INTERNATIONAL, INC established detailed job descriptions for all positions in its hotel properties, including the subject

28

Comfort Inn & Suites and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

j. CHOICE HOTELS INTERNATIONAL, INC set requirements for the hiring process used by the subject Comfort Inn & Suites and oversaw employee discipline processes and termination decisions;

k. CHOICE HOTELS INTERNATIONAL, INC provided benefits for employees of the subject Comfort Inn & Suites;

l. CHOICE HOTELS INTERNATIONAL, INC required the subject Comfort Inn & Suites to use a customer resource management program maintained and operated by CHOICE HOTELS INTERNATIONAL, INC;

m. CHOICE HOTELS INTERNATIONAL, INC controlled channels for guests to report complaints or provide feedback regarding the subject Comfort Inn & Suites location and directly participated in the response and/or supervised the response to customer complaints or other feedback. CHOICE HOTELS INTERNATIONAL, INC retained the right to provide refunds or other compensation to guests and to require the subject Comfort Inn & Suites to pay associated costs;

n. CHOICE HOTELS INTERNATIONAL, INC generated reports and analysis of guest complaints and online reviews for the subject Comfort Inn & Suites;

o. CHOICE HOTELS INTERNATIONAL, INC required the subject Comfort Inn & Suites to use a Guest Relations Application owned, operated, and maintained by CHOICE HOTELS INTERNATIONAL, INC to manage all guest data and information. CHOICE HOTELS INTERNATIONAL, INC could use and did use the backend of this system to analyze data and generate reports;

29

p. CHOICE HOTELS INTERNATIONAL, INC set detailed requirements for insurance that the subject Comfort Inn & Suites must purchase and retained the right to purchase insurance for the subject Comfort Inn & Suites and to bill them directly for that insurance if CHOICE HOTELS INTERNATIONAL, INC determined that they had not purchased adequate insurance;

q. CHOICE HOTELS INTERNATIONAL, INC regularly audited the books and records of the subject Comfort Inn & Suites;

r. CHOICE HOTELS INTERNATIONAL, INC conducted frequent and unscheduled inspections of the subject Comfort Inn & Suites;

s. CHOICE HOTELS INTERNATIONAL, INC retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of any agreements if the subject Comfort Inn & Suites violated any of their detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the subject Comfort Inn & Suites;

t. CHOICE HOTELS INTERNATIONAL, INC controlled all marketing for the subject Comfort Inn & Suites and prohibited them from maintaining any online presence unless specifically reviewed and approved by CHOICE HOTELS INTERNATIONAL, INC;

u. CHOICE HOTELS INTERNATIONAL, INC imposed detailed recordkeeping and reporting requirements on the subject Comfort Inn & Suites regarding virtually all aspects of hotel operations;

v. CHOICE HOTELS INTERNATIONAL, INC supervised and controlled day-to-day operations of the subject Comfort Inn & Suites through detailed information and extensive reports that it obtained through the property management system and other software systems it required the subject Comfort Inn & Suites to use; and

w. CHOICE HOTELS INTERNATIONAL, INC retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

104.    CHOICE HOTELS INTERNATIONAL, INC manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, internet access, cleanliness and other hotel brand related policies.[29]

105.    CHOICE HOTELS INTERNATIONAL, INC requires its branded properties, including the subject Comfort Inn & Suites, to comply with its corporate polices relating to security and safety, human rights, ethics, corporate governance, and compliance with the law.[30]

106.    CHOICE HOTELS INTERNATIONAL, INC gathers data from its customers including names, payment information, reservation history, browsing data, and other details associated with stays.[31]

**Parent Hotel Defendants Knowingly Benefited from Participation in a Venture with Their Franchisee Locations**

107.    Hotel brands own properties and lend their name and likeness to third party owners, while the building and operations are under the brands' supervision and control. This is done through brand standards, franchise agreements, and maintaining control over all aspects of operations. This allows the parent brand to exchange the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning a local property or franchise contract and still profit. Because of this, the hotel locations and parent brands—here WYNDHAM BRAND DEFENDANTS and The Ramada and Days Inn; and CHOICE HOTELS INTERNATIONAL, INC and Comfort Inn & Suites—are inextricably intertwined.

---

[29] Why Choice?, Why Choice Hotels - Choice Hotels Development (last visited Aug 8, 2024).

[30] See *Human Rights Policy*, Human Rights Policy Statement - Choice Hotels International  (last visited Aug 8, 2024).

[31] Choice Hotels International, Inc. *Privacy and Security,* Choice Hotels Privacy and Security Policy (last visited Aug 8, 2024).

108.     The average customer does not see this relationship. The parent brand gives the franchisee property its identity. The parent brand provides the signage that assures customers that if they check into that hotel they can expect the standards consistent with the parent brand. The parent companies – WYNDHAM BRAND DEFENDANTS and CHOICE HOTELS INTERNATIONAL, INC—hold themselves out to the public as the owners of the property. These brand requirements are contractual with the power to control weighed heavily toward the corporate parent brand.

109.     At all times of trafficking alleged herein and currently, booking and room reservations are controlled by the corporate parent brand, i.e. PARENT HOTEL DEFENDANTS.[32]

110.     Upon information and belief, at all times of trafficking alleged herein and currently, the franchised hotels, typically pay a percentage of their total revenue back to the parent company and is required to develop and maintain the property in accordance with the parent brand's standards as they are laid out in the franchise agreement.

111.     Upon information and belief, per the franchise agreements, the PARENT HOTEL DEFENDANTS may enforce standards through periodic inspections and even termination of the franchise agreement if the franchise hotel is found to be inadequate. The right of the PARENT HOTEL DEFENDANTS to enforce their brand standards, including safety standards, is not just their right but their responsibility.

112.     At all times of trafficking alleged herein, PARENT HOTEL DEFENDANTS dictated franchisee policies related to safety, security, human trafficking, employee training and franchisee's response.

113.     Upon information and belief, at all times of trafficking alleged herein, reservation information for rooms at the subject motels passed through a system operated and managed by

---

[32] Meyer, Ellen, April 10, 2018. *The Origins and Growth of Franchising in the Hotel Industry.* Lodging Magazine.

the parent companies—WYNDHAM HOTELS & RESORTS, INC and CHOICE HOTELS INTERNATIONAL, INC.

114. Defendants profited from the sex trafficking of JANE DOE when they rented rooms to JANE DOE and/or her trafficker when they knew or should have known that human trafficking was occurring.

115. JANE DOE's trafficker would rent multiple rooms at once to traffic multiple girls. Defendants profited from each and ever room that was rented by JANE DOE's trafficker.

116. Defendants benefited from the steady stream of income that JANE DOE's trafficker brought to their hotels and hotel brands. Defendants profited from each and every room that JANE DOE's trafficker rented where JANE DOE was harbored and maintained for the purpose of sex trafficking. They profited from the multiple rooms that JANE DOE's trafficker would rent to traffic multiple girls at once.

117. Defendants facilitated the trafficking through its practices, policies, and procedures. They failed to take appropriate action to prevent the trafficking of individuals, including JANE DOE and the other victims she was trafficked with, for sex so they could continue to profit from the room rentals, and business that trafficking brings.

118. PARENT HOTEL DEFENDANTS and HOTEL DEFENDANTS owned and operated the subject properties while buyers paraded in and out of rooms rented for the purpose of trafficking JANE DOE and the other young victims trafficked with her. Their employees and agents observed and should have observed the buyers parading in and out of its hotel rooms to engage in the sex trafficking of JANE DOE and others. Their employees and agents observed or should have observed the trafficking occurring regularly and for multiple days at a time at the subject hotel locations but ignored it so they could profit.

119. JANE DOE's trafficking at the subject hotel locations was a result of PARENT HOTEL DEFENDANTS' and HOTEL DEFENDANTS' participation in a venture with each other and criminal traffickers. If PARENT HOTEL DEFENDANTS and HOTEL DEFENDANTS had not continued participating in a venture that they knew or should have

known violated 18 U.S.C. §1591(a), they would not have received a benefit from JANE DOE's trafficking at the subject hotel locations.

120.   Despite its actual or constructive knowledge that the venture it was engaged in was in violation of 18 U.S.C. §§1591(a), and 1595(a) through the conduct of hotel staff and the widespread trafficking at the subject hotel locations named herein, PARENT HOTEL DEFENDANTS participated in the venture by continuing to associate with the hotel staff and with other HOTEL DEFENDANTS to operate the hotel locations named herein in a way that it knew or should have known would lead to further violations of 18 U.S.C. § 1591(a) including trafficking of victims like Plaintiff.

121.   PARENT HOTEL DEFENDANTS and HOTEL DEFENDANTS financially benefitted from renting hotel rooms to JANE DOE and JANE DOE's trafficker on numerous occasions.

122.   PARENT HOTEL DEFENDANTS participated in this venture through the conduct described herein as they were jointly responsible for relevant aspects of hotel operations.

**Hotel Defendants Facilitated Trafficking of Plaintiff**

123.   HOTEL DEFENDANTS had both actual and constructive knowledge of the trafficking of JANE DOE at the hotel locations they owned and operated because the trafficking was the direct result of HOTEL DEFENDANTS facilitating her trafficking at the subject locations.

124.   HOTEL DEFENDANTS are responsible for the acts, omissions, and knowledge of all employees of the subject hotel locations when operating the hotel because these acts and omissions were committed in the course and scope of employment. HOTEL DEFENDANTS ratified these acts and omissions because HOTEL DEFENDANTS failed to exercise reasonable care in the hiring, training, and supervision of these employees given the specific risks known and reported to HOTEL DEFENDANTS of sex trafficking occurring that the subject hotel locations.

125.     Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject locations, HOTEL DEFENDANTS continued renting rooms to traffickers, including the rooms used to sexually exploit JANE DOE and other victims.

126.     HOTEL DEFENDANTS knew or were willfully blind to the fact that JANE DOE was being trafficked and, despite this, benefited from continued association with her trafficker by providing them with a venue in the form of hotel rooms and related services, to harbor and facilitate JANE DOE's sexual exploitation.

127.     HOTEL DEFENDANTS also facilitated widespread trafficking at their hotel locations, including the trafficking of JANE DOE and the other victims that were trafficked with her in ways including:

- Allowing inappropriate and inadequate practices for hiring, training, supervising, managing and disciplining front line staff regarding issues related to human trafficking;

- Inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

- Choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, laws, and/or applicable franchisor policies and procedures; and

- Implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

**Parent Hotel Defendants Facilitated the Trafficking of JANE DOE at the Subject Hotel Locations**

128.     Upon information and belief, during the times JANE DOE was trafficked at the subject properties, PARENT HOTEL DEFENDANTS participated directly in aspects of the

operation of those subject hotels that influenced whether and to what extent trafficking offered at the hotels, including but not limited to the trafficking of JANE DOE as follows:

- PARENT HOTEL DEFENDANTS assumed responsibility and control over the human trafficking response of their subject motel properties, including design and implementation of practices to prevent trafficking, safety, and security procedures, employee, and franchisee education, training and response, partnership with external organizations, and advocacy;

- PARENT HOTEL DEFENDANTS retained control over when its branded hotels would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in their branded hotel locations;

- PARENT HOTEL DEFENDANTS retained control over determining which hotels needed additional training or other resources on the risk of trafficking occurring and other related criminal activity;

- PARENT HOTEL DEFENDANTS retained control to terminate hotel staff and/or a franchising agreement based on the response to human trafficking;

- PARENT HOTEL DEFENDANTS determined whether the training is provided, when it is provided, the content of the training, how the training is delivered, who receives it, and the consequences of someone not participating or failing to follow such training; and

- PARENT HOTEL DEFENDANTS retained control over setting, supervision, overseeing, and enforcement policies and procedures for housekeeping services at the subject motel locations, including how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services.

129.    As a direct and proximate result of these egregious practices on the part of the PARENT HOTEL DEFENDANTS, JANE DOE and other victims of sex trafficking and

exploitation have been permanently injured and damaged physically, emotionally, psychologically, and financially.

**Defendants' Knowledge of Sex Trafficking at Their Locations**

130.    Defendants' knowledge is not limited to a general awareness of the problem of sex trafficking in the hotel industry. Defendants have known, since well before JANE DOE was trafficked, that sex trafficking was ongoing and widespread at their branded properties, including the subject properties named herein.

131.    Use of the PARENT HOTEL DEFENDANTS' branded properties for sex trafficking is well known to Defendants. Upon information and belief, before and at the time JANE DOE was trafficked at the subject hotel properties, each of the HOTEL DEFENDANTS monitored criminal activity occurring at the branded hotels and were aware of activity indicating commercial sex, sex trafficking, and related crimes occurring at those branded hotels, including the specific hotel properties where JANE DOE was trafficked.

132.    Defendants knew staff at its branded properties were facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at their brand properties, including but not limited to not implementing policies and procedures known to be necessary to stop known trafficking; not requiring identification cards or "IDs"; allowing daily payments of cash for extended stays; complying with requests for rooms to be rented away from other guests; allowing traffickers to escort bruised and battered women to rooms without IDs; allowing several buyers to come in and out of the rooms victims were trafficked in without ID; ignoring yelling and screaming from rooms where trafficking took place; ignoring obvious copious amounts of sex paraphernalia; not addressing the trafficking signs and reports of drugs, abuse and prostitution; forming relationships with traffickers and treating traffickers like "regulars" with benefits by accommodating specific requests that entail known signs of trafficking and not reporting the trafficking or taking any steps to prevent or stop it.

37

133. Defendants have access to reviews left by guests on websites wherein guests frequently complain about the prevalence of obvious trafficking, hearing physical violence by traffickers, and other signs of trafficking.

134. Information that has become public through news stories establishes the entrenched and pervasive nature of Defendants' role in providing a venue where sex trafficking has continued unabated for years. Defendants have provided the means necessary for traffickers to traffic victims, including JANE DOE.

135. During the period JANE DOE was trafficked at the subject locations named herein, there were obvious signs that her trafficker was engaged in sex trafficking.

136. Other girls, including minors were trafficked at the same hotels at the same time as JANE DOE by the same trafficker.

137. JANE DOE's trafficker was often present with JANE DOE at check in and would linger around the hotel or in the parking lot while JANE DOE and the others were forced to have sex with customers at the subject hotels. These signs were all in plain sight of Defendants' employees at the subject locations. JANE DOE's trafficker could be seen leaving the room when another male arrived and then returning as soon as that male left. This would happen multiple times a day, every day, for months.

138. JANE DOE's trafficker had been trafficking other girls, including at least one minor, before he started trafficking JANE DOE. Upon information and belief, JANE DOE's trafficker used the same subject hotels named herein to traffic those young girls. JANE DOE's trafficker would have been seen, by hotel employees, trafficking these girls months before JANE DOE was even victimized.

139. There was heavy foot traffic in and out of the rooms where JANE DOE was being harbored. This foot traffic involved men who were not hotel guests. Several men came in and out of the subject hotel rooms in a single day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time. Their comings and goings were visible to hotel employees that were located at front desks and around the property. A reasonable hotel would

have seen these regular "red flag" interactions at their property in plain sight and Defendants should have seen it by and through their employees and agents.

140. There were obvious signs of trafficking which included well known "red flags" for trafficking in a hotel, such as condoms, sex paraphernalia, and lingerie. These things were not only visible to but must have been seen by hotel employees entering and cleaning the rooms or even just collecting the trash.

141. When forced and coerced into coming and going from the subject motel locations, JANE DOE and the minors being trafficked as well looked unhealthy, unhappy, abused, and scared. Her trafficker and/or associates were always watching her, and her noticeable demeanor was visible to hotel employees they passed by.

142. Upon information and belief, multiple employees at the subject hotel locations named herein, including management-level employees, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

143. As such, Defendants knew or were willfully blind to the fact that Plaintiff was being trafficked at the subject motel locations named herein.

144. A brief examination of just a handful of examples for each Defendant suffices to show the extraordinary frequency with which Defendants have long received and continue to receive evidence and reports that human trafficking is a known issue at their hotel locations and even more specifically as it relates to JANE DOE.

1. **Knowledge of WYNDHAM BRAND DEFENDANTS**

145. Long before JANE DOE was trafficked at the subject Days Inn and Ramada, the WYNDHAM BRAND DEFENDANTS knew about widespread sex trafficking at Wyndham hotels.

146. The problem of sex trafficking at Wyndham hotels was so well known that in 2011, there was a petition with thousands of signatures to stop Wyndham hotels from supporting child sex trafficking. While the WYNDHAM BRAND DEFENDANTS publicly committed to take steps to stop facilitating trafficking, it was an empty promise. The Wyndham brand has been

named a "major contributor to sexual exploitation" and part of the "dirty dozen list" by the National Center on Sexual Exploitation.[33]

147. Upon information and belief WYNDHAM BRAND DEFENDANTS had knowledge and notice as to the widespread sex trafficking on their properties because they claim they are committed to supporting the end of human trafficking with training and resources for team members and franchisees through impactful partnerships with BEST, Polaris, PACT and more.

148. Upon information and belief WYNDHAM BRAND DEFENDANTS had knowledge and notice as to the widespread sex trafficking on their properties because their own business principles include zero tolerance for modern slavery, human trafficking, the use of child, forced, indentured, or involuntary labor or any violation of Human Rights in any of their operations or any of their properties, yet despite having notice, continued to rent rooms to JANE DOE's trafficker and facilitate her trafficking.

149. Upon information and belief WYNDHAM BRAND DEFENDANTS had knowledge and notice as to the widespread sex trafficking on their properties because their own business principles identify the signs of violations of human rights, including JANE DOE who appeared malnourished, showed signs of abuse, and was not allowed to speak for themselves.

150. In the past twenty years, Wyndham brand hotels have been mentioned in at least two hundred criminal trafficking cases filed by the government.[34]

151. News stories have established the entrenched and pervasive nature of WYNDHAM BRAND DEFENDANT'S role in providing a venue where sex trafficking has continued for years. This information was known and monitored by WYNDHAM BRAND DEFENDANTS. The following are a few examples of these news stories on the widespread presence of sex trafficking activity at Wyndham branded hotels:

---

[33] https://endsexualexploitation.org/wyndham/
[34] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/

- In 2010, a man was arrested on human trafficking charges, accused of forcing teens into prostitution at a Wyndham hotel.[35]

- In 2011, a man was sentenced for sex trafficking after he forced minor girls to engage in commercial sex at hotels including a Super 8 Motel in Virginia.[36]

- In 2011, a woman was sentenced to 9 years in prison for sex trafficking two 14-year-old girls. The girls were forced into commercial sex acts at the Days Inn in Hartford, Connecticut.[37]

- In 2012, a man was arrested for having trafficked a 14-year-old girl at a Florida Days Inn.[38]

- Two teenage victims of sex trafficking were exploited at a Days Inn in Pennsylvania in 2012 and 2013. The victims brought civil suits against Days Inn.[39]

- In June 2014, two were charged with trafficking a 13-year-old girl at a Minnesota Super 8.[40]

- In 2013, a man was arrested on human trafficking charges after he forced a woman into commercial sex at hotels, including a Super 8 Motel out of Louisiana.[41]

---

[35] Man arrested in Metairie on human trafficking charges; accused of forcing North Carolina teens into prostitution, NOLA.com (Jul 20, 2010), Man arrested in Metairie on human trafficking charges; accused of forcing North Carolina teens into prostitution | Crime/Police | nola.com

[36] Gang member sentenced for sex trafficking in Prince William, News & Messenger (Manassas, Virginia) (November 4, 2011) https://plus.lexis.com/api/permalink/562d85d9-e662-4e4f-8f7f-67b52fa537e8/?context=1530671

[37] East Hartford Woman Sentenced to 9 Years In Prison for Sex Trafficking Of Two 14-Year-Old Girls, Hartford Courant (June 24, 2011), https://www.courant.com/2011/06/24/east-hartford-woman-sentenced-to-9-years-in-prison-for-sex-trafficking-of-two-14-year-old-girls/.

[38] Federal officials catch, arrest man alleged to have prostituted Jupiter girl, 14, The Palm Beach Post (March 31, 2012) https://www.palmbeachpost.com/story/news/crime/2012/02/08/federal-officials-catch-arrest-man/7283405007/

[39] https://northeasttimes.com/2019/04/02/roosevelt-inn-days-inn-named-in-sex-trafficking-lawsuits/

[40] https://www.grandforksherald.com/newsmd/moorhead-police-charge-two-with-sex-trafficking-13-year-old

[41] https://www.endslaverytn.org/news/tenn-man-booked-in-human-trafficking-newsarticle

152.    These articles are only limited representative examples. There are many other articles about sex trafficking and other criminal activities at Wyndham branded hotels.

153.    Upon information and belief WYNDHAM BRAND DEFENDANTS are, and were at all times, aware of additional significant law enforcement activity related to trafficking at Wyndham hotels that were not reported in the media.

## 2.  Knowledge of WYNDHAM BRAND DEFENDANTS and MAGNA HOTELS INC

154.    The indica of sex trafficking at the subject Days Inn was open and apparent to defendants. Specifically, WYNDHAM BRAND DEFENDANTS, MAGNA HOTELS, INC, and their employees and/or agents should have recognized the following:

- JANE DOE showed visible signs of intoxication and drug use.
- JANE DOE's trafficker was trafficking two minors at the Days Inn during this time and would have been seen by employees at this location. These girls looked young and scared and were controlled by JANE DOE's same trafficker. These young girls would often have visible "hickeys" on their bodies as they were paraded through the lobby and/or the rest of the hotel by JANE DOE's trafficker.
- Oftentimes, JANE DOE's trafficker would rent multiple rooms for the girls. He would rent the rooms for the girls and then they were forced to stay there to take dates.
- JANE DOE's trafficker appeared paranoid every night.
- This hotel was used by JANE DOE's trafficker for days at a time, encountering the same staff. JANE DOE's trafficker used this Days Inn for months, even before he started trafficking JANE DOE.
- JANE DOE showed signs of fear, anxiety, tension, submission and/or nervousness.
- The hotel staff would stare at plaintiff in a judgmental manner.
- JANE DOE showed signs of physical abuse, restraint, and/or confinement.
- JANE DOE exhibited evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way.

42

- JANE DOE showed signs of malnourishment, poor hygiene, fatigue, sleep deprivation, injuries and/or unusual behavior.

- JANE DOE avoided eye contact or interaction with others.

- JANE DOE had no control over possession of money.

- JANE DOE appeared distressed and injured due to being punched in the face multiple times. JANE DOE had bruises and other visible signs of abuse.

- There were individuals, specifically males, frequently entering and leaving the room in which JANE DOE was held.

- There were individuals, specifically males, frequently entering and leaving the other rooms JANE DOE's trafficker rented in which he had the other young girls held.

- The hotel rooms were occupied by people who did not book rooms and were not authorized guests.

- The hotel staff would provide towels and linen changes frequently for JANE DOE's traffickers.

- JANE DOE's trafficker would wait for the housekeepers to come around to request more towels but would not allow the housekeepers to enter the room. They were only allowed to stand at the door.

- Drug use and large amounts of cash were visible to hotel employees from the public hallway.

- Excessive amounts of drugs and foil were present in the room(s) in which JANE DOE was held, which were visible from the public hallway. The remnants of this would have been visible to employees taking out or picking up the trash in these rooms. This was the same for the other rooms rented by JANE DOE's trafficker in which the other girls were being trafficked out of.

- Excessive amounts of sex paraphernalia were present in the room(s) in which JANE DOE was held, including condoms, which were visible from the public

43

hallway. The used condoms would have been visible to employees taking out or picking up the trash in these rooms. This was the same for the other rooms rented by JANE DOE's trafficker in which the other girls were being trafficked out of.

- JANE DOE and the other victims appeared in provocative clothing and/or shoes and could be seen with their trafficker.

- Arguments and fighting would take place in the hotel rooms. JANE DOE's trafficker would yell at her, it was loud and would have been heard by hotel staff/employees. JANE DOE's trafficker was physically abusive and threatened her. JANE DOE feared for her life and this fear would have been apparent to hotel employees.

- JANE DOE was grabbed and pushed to the ground by her trafficker at the subject hotel location and these fights were loud.

- JANE DOE was forced to keep her head down and not make eye contact with anyone at the hotels. She was not allowed to look around or talk to anyone when she and her trafficker were outside of the hotel room.

- JANE DOE's trafficker kept the 'Do Not Disturb' sign on the door at all times and would not let JANE DOE answer the door if hotel staff knocked.

- JANE DOE's trafficker controlled everything she did.

- JANE DOE was often drugged by her trafficker and was controlled by her trafficker as she was taken to and from these hotels, often not coherent.

- JANE DOE appeared drugged and malnourished as she was forced in and out of the hotel rooms by her trafficker.

- JANE DOE's trafficker would leave the room and wait outside the hotel rooms while she was forced to perform the commercial sex acts. Her trafficker would then come back into the room once the "John" left.

- JANE DOE's trafficker would leave visible marks on her from each beating she endured. These marks were clearly visible to the hotel staff that saw her return again and again.
- There was a lot of yelling and arguing. JANE DOE's trafficker would slap and shove her at this location. JANE DOE had a black eye while staying here and this would have been visible to employees.
- If they didn't have the money to pay for the hotel room, JANE DOE would be instructed by her trafficker to let the front desk know he would be by later to pay for the room.

155. The open and apparent nature of this trafficking activity confirmed by the fact that multiple guests noticed the signs of this illegal activity and, upon information and belief, made complaints about this activity to franchisee MAGNA HOTELS, INC and WYNDHAM BRAND DEFENDANTS.

156. All knowledge from the staff at the Days Inn is imputed to MAGNA HOTELS, INC, franchisee who employed the hotel staff. Thus, MAGNA HOTELS, INC knew or should have known of the widespread sex trafficking at the Days Inn, including the activity of JANE DOE's trafficker, based on observations and knowledge of hotel staff and management. In addition to WYNDHAM BRAND DEFENDANTS actual knowledge, this knowledge is imputed to WYNDHAM BRAND DEFENDANTS based on the existence of an agency relationship.

157. WYNDHAM BRAND DEFENDANTS required MAGNA HOTELS, INC. and their hotel staff to report suspected criminal activity at the Days Inn, including sex trafficking to WYNDHAM BRAND DEFENDANTS

158. Upon information and belief MAGNA HOTELS, INC did report numerous instances of suspected sex trafficking to WYNDHAM BRAND DEFENDANTS about the activities of JANE DOE's trafficker and continued to rent rooms to her trafficker.

159. WYNDHAM BRAND DEFENDANTS and MAGNA HOTELS, INC knew staff at its branded properties were facilitating sex trafficking and that it was generating revenue

through policies that encouraged sex traffickers to operate at their brand properties, including but not limited to not enforcing policies and procedures known to be necessary to stop known trafficking: not requiring identification cards or "IDs"; allowing daily payments of cash for extended stays; complying with requests for rooms to be rented away from other guests; allowing traffickers to escort bruised and battered women to rooms without IDs; allowing several buyers to come in and out of the rooms victims were trafficked in without ID; ignoring yelling and screaming from rooms where trafficking took place; ignoring obvious copious amounts of drugs and sex paraphernalia; not addressing the trafficking signs and reports of drugs, abuse and prostitution; and forming relationships with traffickers and treating traffickers like "regulars" with benefits by accommodating specific requests that include known signs of trafficking and not reporting the trafficking or taking any steps to prevent or stop it.

160.     JANE DOE was forced to have sex with customers at the subject Days Inn hotel. This was all in plain sight of Defendants' employees at the subject location. JANE DOE's trafficker could be seen leaving the room when another male arrived and then returning as soon as that male left. This would happen multiple times a day, every day, for months.

161.     There was heavy foot traffic in and out of the rooms where Plaintiff was being harbored. This foot traffic involved men who were not hotel guests. Several men came in and out of the subject hotel rooms in a single day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time. Their comings and goings were visible to hotel employees that were located at front desks and around the property. A reasonable hotel would have seen these regular "red flag" interactions at their property in plain sight and Defendants should have seen it by and through their employees and agents.

162.     There were obvious signs of trafficking consistent with trafficking and which included well known "red flags" for trafficking in a hotel, such as condoms, sex paraphernalia, and lingerie. These things were not only visible but must have been seen by hotel employees entering and cleaning the rooms or even just collecting the trash.

163. When forced and coerced into coming and going from the subject hotel location, JANE DOE looked unhealthy, unhappy, abused, and scared. Her trafficker and/or associates were always watching her, and her noticeable demeanor was visible to hotel employees they passed by.

164. The subject Days Inn located at 10635 Gateway Blvd West, El Paso, TX had front desks and/or lobbies that JANE DOE and her trafficker, as well as the other young victims, would have to walk or drive past in order to get to their rooms and would have been observed by hotel staff.

165. Upon information and belief WYNDHAM BRAND DEFENDANTS had knowledge and notice as to the widespread sex trafficking on their properties because of their own business principles to identify various reporting channels including via the GVP Corporate Compliance and Chief Privacy Officer, IntegrityLINE that operates anonymously 24 hours, HR, and a Service Desk line for urgent requests.

166. Upon information and belief, hotel staff reported signs and activities of JANE DOE's trafficking via one or more of these channels to MAGNA HOTELS, INC, and WYNDHAM BRAND DEFENDANTS. Despite having notice, they continued to rent rooms to JANE DOE's trafficker and facilitate her trafficking.

167. Upon information and belief, multiple employees at the subject hotel located at 10635 Gateway Blvd West, El Paso, TX, including management-level employees, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

168. As such, Defendants knew or should have known that JANE DOE was being trafficked at the subject Days Inn located at 10635 Gateway Blvd West, El Paso, TX.

### 3. Knowledge of WYNDHAM BRAND DEFENDANTS, and KASTURI, INC

169. 152. Plaintiff repeats and realleges the allegations as contained in the preceding paragraphs herein and incorporates the same herein by reference.

170.    WYNDHAM BRAND DEFENDANTS and KASTURI, INC., defendants owned, managed, maintained, inspected, secured, supervised, and/or controlled the brand and policies for booking, rates, operations at Ramada by Wyndham located at 8250 Gateway Blvd E. El Paso, TX 79907, where JANE DOE was commercially sex trafficked on multiple occasions from approximately February to July for six (6) months during 2015. She was transported to this location and forced the remain at this location while commercial sex acts with her were sold and purchased. Rooms were rented out for the purpose of trafficking JANE DOE.

171.    WYNDHAM BRAND DEFENDANTS and KASTURI, INC had constructive knowledge of sex trafficking occurring at the Ramada because Defendants knew that sex trafficking and prostitution are associated with a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that traffickers and buyers of commercial sex acts often use force, fraud, and coercion to induce commercial sex acts from victims.

172.    WYNDHAM BRAND DEFENDANTS and KASTURI, INC knew or should have known that the subject Ramada where JANE DOE was trafficked was known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when JANE DOE and her traffickers other victims were trafficked.

173.    Despite having knowledge of the extensive prostitution and sex trafficking that occurred at their hotels, WYNDHAM BRAND DEFENDANTS and KASTURI, INC repeatedly failed to stop these actions.

174.    WYNDHAM BRAND DEFENDANTS, KASTURI, INC, and their employees and/or agents knew or should have known that illegal sex trafficking was occurring, yet they facilitated the trafficking activity because of the money and financial benefits they received from renting the rooms.

175.    JANE DOE was punched in the face multiple times by her trafficker at this location which resulted in visible purple eyes, a busted lip, and blood. All these injuries would

have been visible and apparent to hotel staff as she continued to stay there and encounter staff again and again.

176.     Upon information and belief, the signs among many others that JANE DOE displayed, were observed by hotel staff and reported to KASTURI, INC. and WYNDHAM BRAND DEFENDANTS, yet despite having notice, they continued to rent rooms to JANE DOE's trafficker and facilitate her trafficking.

177.     Upon information and belief WYNDHAM BRAND DEFENDANTS had knowledge and notice as to the widespread sex trafficking on their properties because their own business principles to identify various reporting channels including via the GVP Corporate Compliance and Chief Privacy Officer, IntegrityLINE that operates anonymously 24 hours, HR, and a Service Desk line for urgent requests.

178.     Upon information and belief, hotel staff reported signs and activities of JANE DOE's trafficking via one or more of these channels to KASTURI, INC, and WYNDHAM BRAND DEFENDANTS, yet despite having notice continued to rent rooms to JANE DOE's trafficker and facilitate her trafficking.

179.     The indica of sex trafficking was open and apparent to defendants. Specifically, WYNDHAM BRAND DEFENDANTS, KASTURI, INC, and their employees and/or agents should have recognized the following:

- JANE DOE's trafficker obtained discounted hotel rooms.
- JANE DOE's trafficker paid for hotel rooms in cash or with cash cards purchased at a drug store.
- JANE DOE's trafficker requested back rooms and those with easy access to the back/side doors of the hotels.
- JANE DOE's trafficker rented hotel rooms for days at a time, encountering the same staff.
- JANE DOE's trafficker kept the 'Do Not Disturb' sign on the door at all times and would not let JANE DOE answer the door if hotel staff knocked.

- The Hotel rooms were occupied by people who did not book rooms and were not authorized guests.

- Arguments, fighting, and yelling took place in the subject hotel rooms.

- JANE DOE's trafficker grabbed and pushed her to the ground at the subject hotel location. JANE DOE's trafficker punched her in the face at the subject hotel location and left her with a battered face.

- There were two others being trafficked by JANE DOE's trafficker at this same location. These two were minors. They looked young, scared, malnourished, and controlled. Employees at the subject location would have seen JANE DOE's trafficker with these two young girls and would have seen her trafficker with her as well.

- There were times that JANE DOE would have to wait for her trafficker to come back and pay for the rooms. JANE DOE would tell the front desk staff that she had to wait for him to come back to pay for the room.

- The hotels employees would personally provide towels and linen changes for JANE DOE's trafficker.

- JANE DOE's trafficker would wait for the housekeepers to come around to request more towels.

- JANE DOE's trafficker was using this location to traffic other victims before JANE DOE was being trafficked there. These young girls would often have visible "hickeys" on their bodies as they were paraded through the lobby and/or the rest of the hotel by JANE DOE's trafficker.

- Drug use and large amounts of cash were visible to hotel employees from the public hallway.

- There were individuals frequently entering and leaving the room in which JANE DOE was held.

- The rooms in which JANE DOE was held smelled of body fluids and musk, which was evident from the public hallway.

- Excessive amounts of drugs and foil were present in the room(s) in which JANE DOE was held, which was visible from the public hallway. The remnants of these things would have been seen by employees and staff taking out the trash from these rooms.

- Excessive amounts of sex paraphernalia were present in the room(s) in which JANE DOE was held, including condoms and lubricant which were visible from the public hallway. The remnants of these things would have been seen by employees and staff taking out the trash from these rooms.

- The Hotel staff would stare at JANE DOE in a judgmental manner.

- JANE DOE's trafficker appeared paranoid.

- JANE DOE showed visible signs of intoxication and illegal drug use while walking through the hotel and encountering staff.

- JANE DOE showed signs of fear, anxiety, tension, submission and/or nervousness.

- JANE DOE showed signs of physical abuse, restraint, and/or confinement.

- JANE DOE showed signs of emotional abuse, and/or being treated in a demeaning way.

- JANE DOE showed signs of malnourishment, poor hygiene, fatigue, sleep deprivation, injuries and/or unusual behavior.

- JANE DOE avoided eye contact or interaction with others.

- JANE DOE had no control over possession of money.

- JANE DOE appeared distressed or injured due to being punched in the face multiple times.

- JANE DOE appeared in provocative clothing and shoes.

- JANE DOE was forced to keep her head down and not make eye contact with anyone at the hotels.

- JANE DOE's trafficker controlled her decisions and conversations.

- JANE DOE was visibly drugged by her trafficker while being transported and taken to and from the subject hotel rooms.

- JANE DOE was often not coherent.

- Signs of physical, mental and emotional abuse were clearly visible to the hotel staff that saw her return again and again.

180.    JANE DOE was forced to have sex with customers at the subject Ramada. JANE DOE's trafficker could be seen leaving the room when another male arrived and then returning as soon as that male left. This would happen multiple times a day, every day, for months. This wasn't only visible as to JANE DOE but also the other two victims being trafficked by her trafficker. These trafficking signs were all in plain sight of Defendants' employees at the subject Ramada location.

181.    There was heavy foot traffic in and out of the rooms at the subject Ramada where Plaintiff was being harbored. This foot traffic involved men who were not hotel guests. Several men came in and out of the subject hotel rooms in a single day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time. Their comings and goings were visible to hotel employees that were located at front desk and around the property. A reasonable hotel would have seen these regular "red flag" interactions at their property in plain sight and Defendants should have seen it by and through their employees and agents.

182.    There were obvious signs consistent with trafficking and which included well known "red flags" for trafficking in a hotel, such as condoms, sex paraphernalia, and lingerie. These things were not only visible but must have been seen by hotel employees entering and cleaning the rooms or even just collecting the trash.

183.    JANE DOE was forced to keep her head down when walking outside of the room with her trafficker. Her trafficker would not let her make eye contact with anyone.

52

184.     The subject Ramada location had front desks and/or lobbies that the trafficker and JANE DOE would have to walk or drive past in order to get to their rooms and would have been observed by hotel staff.

185.     Internet reviews for the subject Ramada location named herein, which WYNDHAM BRAND DEFENDANTS and KASTURI, INC reviewed, read, managed, controlled, and monitored show the pervasiveness of drugs and activity consistent with trafficking before and during the time JANE DOE was trafficked. Here are just a couple of examples:

- A 2012 Yelp review states in part, "the problem is all the occupants (and/or residence) seemed to be hookers and pimps and drug addicts/dealer lurking around in the darkness. We literally had to arm ourself (bring a gunfire all you non gun people) just to get ice…"[42]

- A 2014 Tripadvisor review states in part, "There were people yelling outside at all hours of the night and then my husband walked out there were people that were dressed very inappropriately. It was such a horrible experience we had to leave early. We asked to check out and get a receipt since we paid extra for our dogs and they refused to give us a receipt. We called the upper management for them and from Orbitz and supposedly they are all trying to figure it out. I'm not holding my breath. We will not be using this hotel chain or Wyndham since they are sneaky in their own ways or Orbitz anymore…"[43]

186.     Upon information and belief, multiple employees at the subject Ramada locations, including management-level employees, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

---

[42] https://www.yelp.com/biz/ramada-by-wyndham-el-paso-el-paso?start=10&rr=1
[43] https://www.tripadvisor.com/Hotel_Review-g60768-d501984-Reviews-or40-Ramada_by_Wyndham_El_Paso-El_Paso_Texas.html

187.    As such, WYNDHAM BRAND DEFENDANTS and KASTURI, INC knew or should have known that JANE DOE was being trafficked at the subject Ramada location named herein.

**4.  Knowledge of Defendants' CHOICE HOTELS INTERNATIONAL, INC. and MANIR PROPERTIES II, LP**

188.    Defendants CHOICE HOTELS INTERNATIONAL, INC and MANIR PROPERTIES II, LP owned, managed, maintained, inspected, secured, supervised, and/or controlled the brand and policies for booking, rates, operations at Comfort Inn & Suites located at, 6645 Gateway West, El Paso, TX 79925, where JANE DOE was commercially sex trafficked on multiple occasions from approximately February to July for six (6) months during 2015. She was transported to this location and forced to remain at this location while commercial sex acts with her were sold and purchased. Rooms were rented out for the purpose of trafficking JANE DOE.

189.    Defendants CHOICE HOTELS INTERNATIONAL, INC, and MANIR PROPERTIES II, LP failed to implement and enforce any of their own policies or protect JANE DOE from being sex trafficked and raped multiple times at the subject Comfort Inn & Suites.

190.    Defendants CHOICE HOTELS INTERNATIONAL, INC and MANIR PROPERTIES II, LP allowed, authorized, permitted induced, or encouraged the trafficking of multiple individuals, including JANE DOE for sex as well as at least two other victims being trafficked by JANE DOE's trafficker. Defendants facilitated the trafficking through their practices, policies and procedures. Defendants failed to take appropriate action to prevent the trafficking of individuals, including JANE DOE for sex so that defendants could continue to profit from the business that trafficking brings, including business from all over the state, country and world.

191.    Defendants CHOICE HOTELS INTERNATIONAL, INC and MANIR PROPERTIES II, LP knew or should have known that the subject Comfort Inn & Suites where

JANE DOE was trafficked was known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when JANE DOE was trafficked.

192. Despite having knowledge of the extensive prostitution and sex trafficking that occurred at their hotels, the Defendants have repeatedly failed to stop these actions.

193. Like the other defendants, CHOICE HOTELS INTERNATIONAL, INC has also put out several public statements over the past ten to fifteen years indicating they know that sex trafficking is a problem in the hotel industry and at their hotels and claiming they are committed to fight against it.

194. Despite reports, police activity and investigation of trafficking, and the direct knowledge of trafficking at the subject Choice branded property, CHOICE HOTELS INTERNATIONAL, INC, did not change its ways or policies and procedures no matter how many people it hurt.

195. CHOICE INTERNATOINAL, INC has been named in numerous civil lawsuits arising out of sex trafficking at their properties, including during the time of trafficking of JANE DOE in this case, which puts CHOICE INTERNATIONAL, INC on further notice to the sex trafficking.

196. The indica of sex trafficking was open and apparent to defendants. Specifically, Defendants CHOICE HOTELS INTERNATIONAL, INC and MANIR PROPERTIES II, LP., and their employees and/or agents should have recognized the following:

- JANE DOE's trafficker obtained discounted hotel rooms.

- JANE DOE's trafficker paid for hotel rooms in cash and/or pre-paid cash cards.

- JANE DOE was allowed to pay for the room with cash even though it wasn't in her name. She would pay for the room either in cash or with a prepaid cash card from a drug store.

- JANE DOE's trafficker requested back rooms and those with easy access to the back and side doors of the hotels.

- JANE DOE's trafficker rented hotel rooms for days at a time, encountering the same staff.

- JANE DOE's trafficker kept the 'Do Not Disturb' sign on the door at all times and would not let JANE DOE answer the door if hotel staff knocked.

- The hotel rooms were occupied by people who did not book rooms and were not authorized guests.

- Arguments, fighting, and yelling took place in the subject hotel rooms.

- JANE DOE's trafficker grabbed and pushed her to the ground at the subject hotel location.

- The hotels would personally provide towels and linen changes for JANE DOE's traffickers.

- JANE DOE's trafficker would wait for the housekeepers to come around to request more towels.

- Drug use and large amounts of cash were visible to hotel employees from the public hallway.

- There were individuals frequently entering and leaving the room in which JANE DOE was held.

- The rooms in which JANE DOE was held smelled of body fluids and musk, which was evident from the public hallway.

- Excessive amounts of drugs and foil were present in the room(s) in which JANE DOE was held which was visible from the public hallway. And the remnants of drug paraphernalia would have been observable by hotel staff when taking out the trash.

- Excessive amounts of sex paraphernalia were present in the room(s) in which JANE DOE was held, including condoms and lubricant which were visible from the public hallway. And the remnants of this sex paraphernalia would have been observable by hotel staff when taking out the trash.

56

- There were two other young girls being trafficked at this location by JANE DOE's trafficker. These girls were minors. JANE DOE's trafficker was convicted of trafficking these girls.

- The two other girls looked young, scared, controlled, and not healthy and this would have been visible to the Comfort Inn staff. These young girls would often have visible "hickeys" on their bodies as they were paraded through the lobby and/or the rest of the hotel by JANE DOE's trafficker.

- The Hotel staff would stare at JANE DOE in a judgmental manner.

- JANE DOE's trafficker appeared paranoid every night.

- JANE DOE showed visible signs of intoxication and illegal drug use while walking through the hotel and encountering housekeepers.

- JANE DOE and the other victims showed signs of fear, anxiety, tension, submission and/or nervousness.

- JANE DOE showed signs of physical abuse, restraint, and/or confinement.

- JANE DOE showed signs of emotional abuse, and/or being treated in a demeaning way.

- JANE DOE showed signs of malnourishment, poor hygiene, fatigue, sleep deprivation, injuries and/or unusual behavior.

- JANE DOE avoided eye contact and interaction with others.

- JANE DOE had no control over possession of money.

- JANE DOE appeared distressed or injured due to being punched in the face multiple times.

- JANE DOE and the other victims appeared in provocative clothing and shoes.

- JANE DOE was forced to keep her head down and not make eye contact with anyone at the hotels.

- JANE DOE's trafficker controlled her decisions and conversations.

- JANE DOE was visibly drugged by her trafficker while being transported and taken to and from the subject hotel rooms.

- JANE DOE was often not coherent.

- Signs of physical, mental and emotional abuse were clearly visible to the hotel staff that saw her return again and again.

- JANE DOE's trafficker trafficked other victims for months before trafficking JANE DOE at this subject location.

197.    Defendants CHOICE HOTELS INTERNATIONAL, INC., and MANIR PROPERTIES II, LP knew staff at its branded properties were facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at their properties, including but not limited to: not implementing policies and procedures known to be necessary to stop known trafficking; not requiring identification cards or "IDs"; allowing daily payments of cash for extended stays; complying with requests for rooms to be rented away from other guests; allowing traffickers to escort bruised and battered women to rooms without IDs; allowing several buyers to come in and out of the rooms victims were trafficked in without ID; ignoring yelling and screaming from rooms where trafficking took place; ignoring obvious copious amounts of drugs and sex paraphernalia; not addressing the trafficking signs and reports of drugs, abuse and prostitution; and forming relationships with traffickers and treating traffickers like "regulars" with benefits by accommodating specific requests that entail known signs of trafficking and not reporting the trafficking or taking any steps to prevent or stop it.

198.    JANE DOE was forced to have sex with customers at the subject Comfort Inn & Suites, all in plain sight of Defendants' employees. JANE DOE's trafficker could be seen leaving the room when another male arrived and then returning as soon as that male left. This would happen multiple times a day, every day, for months.

199.    There was heavy foot traffic in and out of the rooms where Plaintiff was being harbored. This foot traffic involved men who were not hotel guests. Several men came in and out of the subject hotel rooms in a single day. These individuals entered and left at unusual hours and

were present at the hotel for brief periods of time. Their comings and goings were visible to hotel employees that were located at front desks and around the property. A reasonable hotel would have seen these regular "red flag" interactions at their property in plain sight and Defendants should have seen it by and through their employees and agents.

200. There were obvious signs of trafficking consistent with trafficking and which included well known "red flags" for trafficking in a hotel, such as condoms, sex paraphernalia, and lingerie. These things were not only visible but must have been seen by hotel employees entering and cleaning the rooms or even just collecting the trash.

201. When forced and coerced into coming and going from the subject Comfort Inn & Suites, JANE DOE and the two minors being trafficked with her looked unhealthy, unhappy, abused, and scared. Her trafficker and/or associates were always watching her, and her noticeable demeanor was visible to hotel employees they passed by.

202. The subject Comfort Inn & Suites had a front desk and/or lobby that the trafficker and JANE DOE would have to walk or drive past in order to get to their rooms and would have been observed by hotel staff.

203. Upon information and belief, multiple employees at the subject Comfort Inn & Suites, including management-level employees, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment. As such, CHOICE HOTELS INTERNATIONAL, INC., and MANIR PROPERTIES II, LP knew or were willfully blind to the fact that JANE DOE was being trafficked at the subject hotel locations named herein.

**Defendants are Jointly Responsible for the Trafficking of JANE DOE**

204. PARENT HOTEL DEFENDANTS and their subject HOTEL DEFENDANTS were participants in a joint venture with each other, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture.

205.    Upon information and belief, the operation of the subject Ramada by Wyndham was part of a single unified operation by WYNDHAM BRAND DEFENDANTS. Upon information and belief, the subject Ramada by Wyndham had a parent company, was subject to joint control, and operated as an integrated enterprise and/or as an alter-ego. Upon information and belief, WYNDHAM BRAND DEFENDANTS acted to own, operate, control, manage, and supervise the subject Ramada by Wyndham location. As an integrated enterprise and/or joint venture, WYNDHAM BRAND DEFENDANTS and the subject Ramada by Wyndham location were separately and jointly responsible for compliance with all applicable laws.

206.    Upon information and belief, the operation of the subject Days Inn by Wyndham was part of a single unified operation by WYNDHAM BRAND DEFENDANTS. Upon information and belief, the subject Days Inn by Wyndham had a parent company, was subject to joint control, and operated as an integrated enterprise and/or as an alter-ego. Upon information and belief WYNDHAM BRAND DEFENDANTS acted to own, operate, control, manage, and supervise the subject Days Inn by Wyndham location. As an integrated enterprise and/or joint venture, WYNDHAM BRAND DEFENDANTS and the subject Days Inn by Wyndham location were separately and jointly responsible for compliance with all applicable laws.

207.    Upon information and belief, the operation of the subject Comfort Inn was part of a single unified operation by CHOICE HOTELS INTERNATIONAL, INC. Upon information and belief, the subject Comfort Inn had a parent company, was subject to joint control, and operated as an integrated enterprise and/or as an alter-ego. Upon information and belief, CHOICE HOTELS INTERNATIONAL, INC acted to own, operate, control, manage, and supervise the subject Comfort Inn location. As an integrated enterprise and/or joint venture, CHOICE HOTELS INTERNATIONAL, INC and the subject Comfort Inn location were separately and jointly responsible for compliance with all applicable laws.

## CAUSES OF ACTION AGAINST DEFENDANTS

### Sex Trafficking under 18 U.S.C. § 1595

1. **Cause of Action: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a)**

208.     Plaintiff realleges and incorporate the allegations in paragraphs 1 through 207.

209.     Plaintiff is a victim of sex trafficking within the meaning of §1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

210.     Defendants are perpetrators within the meaning of 18 U.S.C §1595(a) because they:

    a.   Violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, they harbored individuals, including Plaintiff, knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at its respective hotel property; and

    b.   Violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, it knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at its respective hotel properties.

211.     Violations of 18 U.S.C §1595(a) by each of the Defendants as "perpetrators" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Plaintiff to suffer substantial physical and psychological injuries and other damages as a direct and proximate result of being trafficked and sexually exploited at the Defendants' hotel properties.

2. **Beneficiary Liability under §1595 (a) of the TVPRA (all Defendants).**

212. Plaintiff realleges and incorporate the allegations in Paragraphs 1 through 207, and 208 through 211.

213. Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

214. Through acts and omissions described throughout this Complaint, Defendants received a financial benefit from participating in a venture with each other and traffickers, including Plaintiff's trafficker, despite the fact that each defendant knew or should have known that this trafficker was engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2) at Defendants' properties, including the subject locations alleged in this Complaint. As more specifically alleged above, Parent Hotel Defendants and Hotel Defendants took part in a common undertaking and enterprise involving risk and potential profits, and here, actual profits resulted. Parent Hotel Defendants' and Hotel Defendants' employees had a direct association with the trafficker and knowingly facilitated the trafficker, which, as shown more thoroughly in the incorporated allegations above, showed a continuous business relationship between the trafficker and Defendants such that the pattern of conduct appears to be a tacit agreement between them. Thus, Defendants are liable as a beneficiary under 18 U.S.C §1595(a).

215. Through the acts and omissions described throughout this Complaint, Defendants received a financial benefit from participating in a venture with each other in the operations of its respective hotel properties even though Defendants knew or should have known that this venture was violating 18 U.S.C §§ 1591(a) and 1595(a).

216. Violations of 18 U.S.C §1595(a) by Defendants as "beneficiaries" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Plaintiff to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

### 3. Cause of Action: Vicarious Liability for TVPRA Violations (Parent Hotel Defendants).

217.    Plaintiff realleges and incorporates the allegations in Paragraphs 1 through 207, 208 through 211 and 212 through 216.

218.    Under the TVPRA and the federal common law, each member of a joint venture is vicariously liable for the acts and omissions of all other members of that joint venture.

219.    Under the TVPRA and the federal common law, an entity is vicariously liable for the acts and omissions of its alter-egos.

220.    Hotel Defendants acted as the actual agents of Parent Hotel Defendants when operating its respective hotel properties and in committing the wrongful acts and inactions alleged herein.

221.    Through the wrongful acts and omissions described throughout this Complaint, Parent Hotel Defendants exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by its franchisee to operate its respective hotel property.

222.    Parent Hotel Defendants are vicariously liable for the TVPRA violations of its franchisees, the Hotel Defendants, and the subagents of such.

223.    Additionally, on information and belief, each of the Parent Hotel Defendants participated in a joint venture operating the subject Hotel Defendant locations. They had highly integrated operations at the hotels, shared revenue and profits generated from the hotels, and exercised mutual control over the venture at the hotels. They functioned as a single integrated entity and/or as alter-egos of one another and are therefore each directly and proximately liable for the harms and damages caused to Plaintiff as a result.

### JOINT AND SEVERAL LIABILITY

224.    "Joint and several liability 'applies when there has been a judgment against multiple defendants."[44] If two or more defendants jointly cause harm, each defendant is held

---

[44] *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 220–21 (1994).

liable for the entire amount of the harm; provided, however, that the plaintiff recovers only once for the full amount.[45]

225.    Federal law allows an injured party to sue a tortfeasor for the full amount of damages for an indivisible injury that the tortfeasor's negligence was a substantial factor in causing, without regard to his proportion of fault and even if the concurrent negligence of others contributed to the incident.[46]

226.    The venture or ventures in which each Defendants participated were direct, producing, and proximate causes of the injuries and damages to JANE DOE.

227.    Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to JANE DOE for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

228.    JANE DOE alleges Defendants', and each of them, should be held joint and severally liable to Plaintiff for the totality of her injuries and damages alleged herein.

**DISCOVERY RULE**

229.    To the extent defendants assert an affirmative defense of limitations, JANE DOE invokes the discovery rule. At the time she was harmed and through at least July 2015, JANE DOE was under coercion and control of traffickers who abused and manipulated her. Thus, JANE DOE did not discover and could not have reasonably discovered the legal cause of her injuries more than ten years before she filed this lawsuit. While she was under the control of her traffickers, JANE DOE– through no fault of her own – lacked the information to bring claims because she did not know both her injuries and the cause of her injuries. This lack of information was due to no fault on the part of JANE DOE but rather was a direct result of JANE DOE being kept under the control of her trafficker, which Defendants facilitated.

---

[45] See 735 ILCS 5/2-1117; see Restatement (Second) of Torts § 875 (1977); *Honeycutt v. United States*, 137 S. Ct. 1626 (2017).
[46] *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256 (1979) (citations omitted); *Manganiello v. City of New York*, No. 07 Civ. 3644, 2008 WL 2358922 (S.D.N.Y. June 10, 2008), affirmed, 612 F.3d 149 (2nd Cir. 2010).

230.     At the time JANE DOE was harmed, she did not know that she was the victim of human trafficking as the term is defined by law, that her injuries arose from being trafficked at Defendant's hotels or that she was a person trafficked, much less that she was being victimized by a human trafficking venture, and she did not discover and was not in position to discover the legal cause of her injuries, more than ten years before suit was filed.

231.     To the extent Defendants assert an affirmative defense of limitations, JANE DOE invokes the Doctrine of Equitable Tolling because, as a result of being a victim of trafficking, JANE DOE faced extraordinary circumstances, which arose through no fault of her own, that prevented her from pursing her legal remedies including but not limited to the filing of a lawsuit, and those circumstances did not end more than 10 years before JANE DOE filed this lawsuit. JANE DOE's claims are timely and do not result in prejudice to Defendants.

232.     As a result of her continuous trafficking at the subject hotels through at least July of 2015, Plaintiff was beaten, drugged, sexually assaulted, and mentally abused. She lacked the mental capacity to recognize the extent and scope of her injuries or those responsible particularly those who financially benefited from her trafficking but may not have been seen to be directly involved.

233.     JANE DOE was under the continuous control of her traffickers through at least July 2015. As a result, she did not have the freedom to investigate her claims, to identify those responsible or to seek legal representation necessary to pursue her legal rights. This continuous trafficking resulted from Defendants continuous facilitating of trafficking at the subject hotel locations named herein and Defendants ongoing venture with one another and with criminal traffickers.

234.     To the extent that Defendants assert an affirmative defense of limitations, Plaintiff also invokes the Continuing Tort Doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct.

235.     JANE DOE was subject to continuous trafficking at the subject hotel locations through at least July 2015, which is not more than 10 years before JANE DOE filed this lawsuit.

236.    This continuous trafficking resulted from Defendants continuous facilitation of trafficking at the subject hotel locations named herein and Defendants ongoing venture with one another and with criminal traffickers.

## DAMAGES

237.    Defendants' wrongful acts and omissions described above, individually and collectively, caused JANE DOE to sustain legal damages.

238.    JANE DOE did suffer the following injuries as a direct and proximate result of Defendants', and each of their, wrongful actions and inactions alleged herein, and as such JANE DOE is entitled to be compensated for past and future personal injuries, non-economic damages, and economic damages, see, e.g., 18 U.S.C. §§ 1593, 1595, including:

- actual damages;
- direct damages;
- incidental and consequential damages;
- lost earnings and lost earning capacity;
- necessary medical expenses;
- life care expenses;
- physical pain and suffering;
- physical impairment;
- mental anguish and emotional distress damages (until trial and in the future);
- restitution;
- unjust enrichment; and
- disgorgement of profits.

239.    JANE DOE is entitled to pre- and post-judgment interest at the maximum legal rates.

## PUNITIVE DAMAGES

240.     JANE DOE is entitled to punitive damages under the applicable statutes against Defendants, and each of them, for each and every cause of action alleged herein, as a result of Defendants' outrageous, wanton, willful, and malicious conduct underlying JANE DOE's claims. See *Ditullio v. Boehm*, 662 F.3d 1091 (9th Cir. 2011).

## ATTORNEY FEES

241.     JANE DOE is entitled to recover her costs and reasonable, necessary, or customary attorneys' fees from Defendants under the applicable statutes. See 18 U.S.C. § 1595(a).

242.     All conditions precedent to Plaintiff's recovery of its costs and attorneys' fees have occurred or will occur prior to entry of judgment in this suit.

## JURY DEMAND

243.     JANE DOE requests a jury trial in this action.

## PRAYER

244.     For these reasons, JANE DOE prays that this case be set for trial before a jury, and that upon a final hearing of the cause, judgment be entered for JANE DOE against Defendants jointly and severally, for:

- all economic damages to which she is entitled;
- all actual damages to which she is entitled;
- all incidental and consequential damages to which she is entitled;
- all mental anguish and emotional distress damages to which she is entitled;
- all restitution damages to which she is entitled;
- all disgorgement of profits to which she is entitled;
- all unjust enrichment damages to which she is entitled;
- exemplary, treble, and/or punitive damages;
- attorneys' fees and costs of suit;

- pre-judgment and post-judgment interest at the highest rate allowed by law; and

- all other relief to which she is entitled in law or in equity.


SINGLETON SCHREIBER, LLP


Dated: April 21, 2025          By:   _____

Gerald Singleton (TX 24104254)
Meagan Verschueren (CA 313117) Pro Hac Vice
Katie Llamas (CA 303983) Pro Hac Vice
Attorneys for Plaintiff JANE DOE